FILED

2008 Sep-29  PM 02:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SUNNA REED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-06-S-1504-NE |
| | ) | |
| KCA CORPORATION, K and K | ) | |
| FOOD SERVICES, and HARVEY | ) | |
| BENJAMIN FORDHAM, III, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff, Sunna Reed, asserts claims against K & K Food Services, KCA Corporation, and Harvey Benjamin Fordham, III, for unlawful sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as supplemental state law claims for assault and battery, invasion of privacy, negligent and/or wanton hiring, promotion, retention, supervision, and training, and slander.[1] The case presently is before the court on defendants' motion for a summary judgment and defendants' motion to strike portions of the evidentiary materials submitted by plaintiff in opposition to summary judgment.[2]

---

[1] *See* doc. no. 1 (Original Complaint) and doc. no. 25 (Amended Complaint).

[2] *See* doc. no. 36 (Defendants' Motion for Summary Judgment) and doc. no. 59 (Motion to Strike).

As an initial matter, defendants argue that this court lacks subject matter jurisdiction over KCA Corporation ("KCA") because, they say, KCA did not employ plaintiff.  Defendants also assert that plaintiff's claims against KCA and Harvey Benjamin Fordham, III ("Ben Fordham"), are due to be dismissed because plaintiff never filed an EEOC charge against either defendant.  Defendants also argue that plaintiff has failed to establish a genuine issue of material fact on each of her claims.  Upon consideration of the motion for summary judgment, the parties' briefs, and the evidentiary submissions, the court concludes the motion should be granted as to plaintiff's federal claims.  The motion to strike will be denied as moot, and plaintiff's state law claims will be dismissed without prejudice.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[3]  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time

---

[3] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted) (bracketed text suppled).

## II. SUMMARY OF FACTS

### A.    K & K Food Services

K & K Food Services ("K & K") operates a dining facility on the United States Army's Redstone Arsenal — a military installation located in the southwest quarter of Madison County, adjacent to the corporate limits of the City of Huntsville, Alabama. Plaintiff first worked in that dining facility from March 2001 to December 2002, and

then again from July 2004 until her termination on April 13, 2005.[4]

K & K is a joint venture between Ben Fordham and KCA, but Fordham holds the controlling interest (51%).[5]   Defendant KCA provides financial backing and operational support, while Fordham supervises daily operations.[6]  K & K has operated the Redstone Arsenal dining facility since 1997.[7]  KCA operated the facility prior to K & K's assumption of daily operations.[8]  The employees at the dining facility are subject to K & K's collective bargaining agreement with the Laborers' International Union of North America.[9]

At all times relevant to this action, Ben Fordham — due to his controlling, 51% interest in the joint venture with KCA — was in charge of all operations in the K & K dining facility, and his then wife, Alice Fordham, worked at the facility as a secretary.[10] Frederick Anderson was the vice-president of KCA, and his wife, Kyong Cha Anderson, was the president of that entity.[11]  High-level officials from KCA visited the

---

[4] *See* doc. no. 37 (Defendants' brief in support of summary judgment), Exhibit A (Deposition of plaintiff), at 160.

[5] *Id.*, Exhibit C (Affidavit of Frederick Anderson), ¶ 8 and Exhibit D (Affidavit of Ben Fordham), ¶¶ 2 and 3.

[6] *Id.*, Exhibit D (Affidavit of Ben Fordham), ¶ 3.

[7] *Id.*, Exhibit D (Affidavit of Ben Fordham), ¶ 2.

[8] *Id.*, Exhibit C (Affidavit of Frederick Anderson), ¶ 6.

[9] *Id.*, Exhibit D (Affidavit of Fordham), ¶ 3.

[10] *See* doc. no. 37, Exhibit K (Affidavit of Alice Fordham), ¶ 2.

[11] *Id.*, Exhibit C (Affidavit of Frederick Anderson), ¶ 2.

Redstone Arsenal dining facility five times or less each year.[12]

During plaintiff's second period of employment in the dining facility (July 2004 to April 13, 2005), Dan Tyree served as project manager, and Dennis Hardin served as assistant manager.[13]   Tyree and Hardin typically worked at the dining facility Monday through Friday; in addition, they usually worked a Saturday or Sunday at least once a month.[14]   The various job positions for employees in the dining facility were described as "Cook I," "Cook II," "Mess Attendant Leader," "Mess Attendant," and "Head Counters."[15]   When neither Tyree nor Hardin was present the dining facility, the "Cook I" on-duty served as manager.[16]

## B.   Plaintiff's Employment at the Dining Facility

Plaintiff's aunt, Sun O.K. Williams, began working at the Redstone Arsenal dining facility in 1994.[17]   Williams served as plaintiff's guardian prior to this action. When plaintiff was a teenager, she occasionally visited her aunt during work hours.[18] Plaintiff entered employment at the dining facility as a "Mess Attendant" in March of

---

[12] *Id.*, Exhibit C (Affidavit of Frederick Anderson), ¶ 9.

[13] *Id.*, Exhibit I (Deposition of Dennis Hardin), at 20.

[14] *Id.*, Exhibit E (Affidavit of Dennis Hardin), ¶ 3 and Exhibit I (Deposition of Dennis Hardin), at 26.

[15] *Id.*, Exhibit D (Affidavit of Ben Fordham), ¶ 4.

[16] *See* doc. no. 37, Exhibit E (Affidavit of Dennis Hardin), ¶ 3.

[17] *Id.*, Exhibit E (Affidavit of Dennis Hardin), ¶ 10.

[18] *Id.*, Exhibit A (Deposition of plaintiff), at 89 and 163.

2001.[19]

In December of 2002, plaintiff married, moved to another state, and resigned her job at the dining facility.[20]  Plaintiff later divorced, however, and moved back to the Huntsville area in the summer of 2004.[21]  She was again employed at the dining facility in July of 2004, working as a "Mess Attendant" on a call-in basis, filling-in for other employees.[22]

In the Fall of 2004, plaintiff began working as a "Head Counter," a position that required her to be responsible for admitting soldiers to the dining hall at the beginning of each meal.[23]  For that reason, head counters were required to report to work at least fifteen minutes before a scheduled meal.[24]  As a head counter, plaintiff worked under the supervision of "Mess Attendant Leaders" Clarence Davis and Sue Dodd.[25]

At some point during plaintiff's second period of employment at the dining facility, she reported a fellow employee, Marlin Hardy, to management for "doing some stuff that offended [her]," such as "playing around too much, getting a little too

---

[19] *Id.*, Exhibit F (Affidavit of Dan Tyree), ¶ 15.

[20] *Id.*, Exhibit A (Deposition of plaintiff), at 187.

[21] *Id.* at 175-76.

[22] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 175-76.

[23] *Id.* at 209-10.

[24] *Id.* at 213.

[25] *Id.* at 187-88 and 215-16.

physical," and brushing against her body.[26]   Plaintiff first reported Hardy's behavior to

the "Mess Attendant Leader" on her shift.[27]   That person, however, directed plaintiff

to report Hardy's behavior to someone in management.[28]   Plaintiff then reported to

either assistant manager Dennis Hardin or project manager Dan Tyree that Hardy was

"bothering [her] and that he was getting a little too close or physical."[29]   (In deposition,

plaintiff first asserted that she could not remember whether she reported Hardy to

Hardin or to Tyree, but later stated that she reported him to Tyree.[30])

C.     **Plaintiff's Relationship with Dennis Hardin**

Dennis Hardin had worked at the Redstone Arsenal dining facility since 1975.[31]

He held a variety of positions, including Cook I, Assistant Manager, and Project

Manager.[32]   Plaintiff met Hardin before beginning her first period of employment as a

result of visiting her aunt, Sun O.K. Williams, at the dining facility.[33]   Consequently,

when plaintiff first applied for employment at the dining facility in 2001, and re-

---

[26] *Id.* at 213-215.

[27] *See* doc no. 37 at Exhibit A (Deposition of plaintiff), at 215-16.

[28] *Id.* at 215-16.

[29] *Id.* at 216.

[30] *Id.* at 227.

[31] *Id.*, Exhibit E (Affidavit of Dennis Hardin), ¶ 2.

[32] *Id.*

[33] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 163.

employment in 2004, she listed Hardin as one of three references.[34]

At the time of plaintiff's first employment at the dining facility, Hardin worked as a Cook I.[35]  Plaintiff had no problems with Hardin throughout her first period of employment.[36]  At that time, plaintiff thought of Hardin as a "father figure," and she gave him Christmas and birthday cards.[37]

Hardin was promoted to Assistant Manager between plaintiff's first and second periods of employments at the dining facility.[38]  In that position, Hardin was responsible for assisting project manager Dan Tyree, and scheduling employee work shifts.[39] Hardin allegedly began to sexually harass plaintiff within a month of her re-employment at the dining facility in July of 2004.[40]

## D.   K & K's Sexual-Harassment Policy and Work Rules

Throughout both periods of plaintiff's employment, a poster advising employees to report claims of sexual harassment was displayed on the same wall that employee

---

[34] *Id*. at 162-63 and 183-84.

[35] *Id*. at 253.

[36] *Id*. at 173 and 180.

[37] *Id*., Exhibit E (Affidavit of Dennis Hardin), ¶ 12 and Exhibit A (Deposition of plaintiff), at 283-85.

[38] *Id*., Exhibit I (Deposition of Dennis Hardin), at 20.

[39] *See* doc. no. 37, Exhibit E (Affidavit of Dennis Hardin), ¶¶ 3 and 4.

[40] *Id*., Exhibit A (Deposition of plaintiff), at 221.

work schedules were posted, and on which employees signed daily time sheets.[41]  The

poster provided that:

> You Have a Right to a Harassment-Free Workplace!  Sexual harassment
> is unlawful and unacceptable in the workplace.   Unwelcome sexual
> advances, requests for sexual favors, and other verbal and physical
> conduct of a sexual nature constitute sexual harassment.
>
> Sexual harassment is illegal whether it is initiated by a supervisor, a
> manager, a coworker, or any non-employee.
>
> Because of the importance we place on these types of issues, this
> company has instituted a procedure for investigating harassment
> complaints.  It is our policy to investigate and resolve these issues in a
> prompt manner.[42]

The poster further advised employees that, "[i]f you have been harassed, or another's

conduct creates an intimidating, hostile, or offensive work environment, please notify

one of the people listed below immediately."[43]  The poster then listed Dan Tyree and

Ben Fordham and their respective telephone numbers, and advised employees to

contact either of those individuals "[t]o report a harassment issue or for more

information."[44]

Moreover, when employees were hired at the dining facility, they signed an

---

[41] *Id.*, Exhibit F (Affidavit of Dan Tyree), ¶ 6.

[42] *Id.*, Exhibit F (Affidavit of Dan Tyree), at Exhibit B (Sexual Harassment Poster).

[43] *Id.*

[44] *Id.*

Employment Agreement, a portion of which stressed the importance of maintaining accurate time records, and, the consequences of failing to do so.  The pertinent portion of the Agreement read as follows:

> I understand that keeping accurate time records is a condition of my employment.  I must sign my time record each day stating that it is accurate. . . .  If I sign a time record that is not correct, K & K can fire me. . . .  If any person changes my time card so that it is not accurate, or orders me to do so, I will report it to K & K.  If anyone asks me to sign a time record that is not correct, I will report it to K & K.  K & K will not discipline or fire me for reporting any of the above things, but if I do not report it, I understand that K & K will fire me.[45]

Employees also received a copy of the "Company Work Rules" when they were hired, and signed an acknowledgment of reading the rules.[46]  Relevant to this case, Rule number 23 provided that:

> Employees will have their employment terminated as a result of habitual or recurring offenses where the warning procedures have not been heeded.  In addition[,] dismissal will occur without prior disciplinary warnings for the following offenses:
>
> - falsifying company records or making a false statement
>
> - falsely reporting time worked
>
> . . .
>
> - proven serious sexual harassment of another employee or

---

[45] *See* doc. no. 37, Exhibit D (Affidavit of Ben Fordham), at Exhibit D (Employee Agreement).

[46] *Id.*, Exhibit F (Affidavit of Dan Tyree), ¶ 7.

customer.[47]

**E.    Hardin's Allegedly Harassing Behavior**

When plaintiff returned to work at the dining facility during July of 2004, Hardin told her that he was "hurt" over the fact that she had married and moved away from the area without telling him.[48]   Plaintiff did not take Hardin's comment to be sexual in nature, but it made her uncomfortable.[49]   Even so, plaintiff did not consider the comment sufficiently uncomfortable to report to anyone in management; in short, she "left it alone."[50]   Moreover, plaintiff testified that, even if she had believed that Hardin's comment was inappropriate and offensive, she still would not have reported it to management because

> the second time [Hardin] said that he was management and they've always told us that – and Mr. Hardin has told me himself that if somebody calls Mr. Anderson or going over him they're not listening to us because they go by what [Hardin] says.  Then he referred to some incident that's happened in the past and that he's still there and the other employees are not longer employed, so.[51]

In July or August of 2004, Hardin telephoned plaintiff, to ask her whether she could cover a shift, but then asked her personal questions, such as "what are you doing

---

[47] *Id.*, Exhibit D (Affidavit of Ben Fordham), at Exhibit C (Company Work Rules), ¶ 23.

[48] *Id.*, Exhibit A (Deposition of plaintiff), at 221-22.

[49] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 222-23.

[50] *Id.* at 225.

[51] *Id.* at 226.

tonight[?], did you miss me?"[52]   The questions bothered plaintiff; but, once again, she did not report the incident to anyone.[53]   She explained her reasons for failing to do so as follows:

> I thought if I addressed it because [Hardin's] in management position they were probably going to brush it off.  And most – if it goes to management it has to go through [Hardin] anyway, so if [Hardin's] doing it then – even the union, they told us not to even go to the union.  They – both management has said that whatever issues that arise within the company need to be worked out within the company.[54]

Plaintiff acknowledged that she could have reported any inappropriate behavior to Dan Tyree (not to mention Ben Fordham).[55]   She explained her reasons for failing to report the incident to Dan Tyree as follows:

> [Hardin] told me that [Dan Tyree] does whatever he tells him to do, that really doesn't give me too much of an opportunity.  Ultimately, the way I look at it is if I complained to [Tyree], [Tyree] is going to address it to [Hardin] and according to [Hardin], [Hardin] said that [Tyree] does whatever [Hardin] tells him to do.  It's just going back around in a circle, so.[56]

Plaintiff also testified that she once walked by Hardin's office and saw him rubbing between the legs of "Tammy," another female employee at the dining facility.[57]

---

[52] *Id.* at 231-32.

[53] *Id.,* at Exhibit A (Deposition of plaintiff), at 232-33.

[54] *Id.* at 232.

[55] *See* doc. no. 37 at Exhibit A (Deposition of plaintiff), at 232-35.

[56] *Id.* at 234-35.

[57] *Id.* at 236-37.

Hardin and other employees later told plaintiff that "Tammy" was terminated because she had complained about Hardin, but plaintiff admitted that she was "not sure" about either the reason for the female employee's termination, or who terminated her.[58]

Plaintiff testified that another female employee, Shannon Williams, also told her that she had reported Hardin for sexually harassing her, and she then was terminated.[59] Hardin told plaintiff that "he had something to do" with the termination of Shannon Williams, and that, "regardless [of] whether it was her or anyone that complains about him, he has the final say so and he pointed out the fact, he said, I'm still working here and they're not."[60]

Hardin called plaintiff's cellular telephone number and left personal messages on her voicemail on several occasions between September and November of 2004.[61] Plaintiff retained tape recordings of some of those messages, in which Hardin referred to her as "Boo," and said "if you love me, call me," and that he wanted to see her after work.[62]  Plaintiff, however, did not report any of those telephone calls or messages to Dan Tyree, Ben Fordham, or the union.[63]

---

[58] *Id*. at 238-40.

[59] *Id*. at 240-43.

[60] *Id*. at 245.

[61] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 248.

[62] *Id*. at 248.

[63] *Id*. at 248-50.

Hardin acquired so-called "veneers" (porcelain coatings over his teeth) in or about November of 2004, and told plaintiff that he had purchased the cosmetic devices to appear more attractive to her, and asked her whether she had noticed his new teeth.[64] Once again, plaintiff did not report those comments to Dan Tyree or Ben Fordham.[65]

Around Christmas of 2004, Hardin told plaintiff that he was "well packed," and "[she] wouldn't be able to handle him."[66]  Those statements were made in the dining facility, but no one was sufficiently near plaintiff and Hardin to overhear the comments.[67]  Hardin also gave plaintiff a lace camisole, panty set, and an aroma therapy set sometime "around the holidays," when she went to his home to pick up Avon products.[68] Plaintiff accepted the gifts and thanked Hardin for them, but she does not recall whether she opened the gifts while she was at Hardin's home.[69]  Sometime during the same holiday period, Hardin told plaintiff that, if she was "good to him," she would be awarded more (or better) work hours.[70]

---

[64] *Id.*, Exhibit A (Deposition of plaintiff), at 272-73 and Exhibit E (Affidavit of Dennis Hardin), ¶ 23.

[65] *Id.*, Exhibit A (Deposition of plaintiff), at 273.

[66] *Id*. at 274-75.

[67] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 275.

[68] *Id.*, Exhibit A (Deposition of plaintiff), at 276-77 and Exhibit E (Affidavit of Dennis Hardin), ¶ 26.  Hardin brought his mother's Avon catalogs to the dining facility in order for employees to order Avon products.  When the Avon products came in, Hardin states that he brought the items to work and then got payment from the employees.

[69] *Id.*, Exhibit A (Deposition of plaintiff), at 277.

[70] *Id*. at 278-79.

Between November of 2004 and March of 2005, Hardin rubbed his crotch against plaintiff's legs and buttocks approximately ten times at the dining facility.[71] Plaintiff believed that the touching was intentional because, she said, Hardin could have walked in the other direction, and, he once said "you like that, don't you" while touching her.[72]   On one occasion, Hardin came up behind plaintiff as she was putting up silverware, rubbed against her, and grabbed her thigh.[73]   The only person that observed this touching was a soldier.[74]   Plaintiff states that Hardin was "pretty sly," and that he did not touch her in front of other employees.[75]   Plaintiff did not report any of the alleged touchings to Dan Tyree or Ben Fordham, but acknowledged that she knew that she could report Hardin's conduct to either of those individuals.[76]

In or around March of 2005, plaintiff went to Hardin's home to pick up Avon products that her aunt, Sun O.K. Williams, had ordered through Hardin's mother.[77] Hardin told Ms. Williams that she and plaintiff needed to pick up the Avon products from his home.[78]   Plaintiff asserts that her aunt, "not know[ing] what was going on at

---

[71] *Id.* at 258-63, and 288-89.

[72] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 265-66.

[73] *Id.* at 258.

[74] *Id.*

[75] *Id.* at 259.

[76] *Id.* at 260-62.

[77] *Id.* at 266-69.

[78] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 266.

the time," sent her to Hardin's house.[79]  Hardin asked plaintiff to sit on his lap while she was at his house, and he grabbed her arm at one point.[80]  Once again, plaintiff did not report the incident to Tyree or Fordham.[81]

At the dining facility, Hardin frequently asked plaintiff why she talked to the soldiers, and allegedly displayed "an agitated expression on his face" whenever  she spoke to soldiers.[82]  Plaintiff considered Hardin's questions and expression to be offensive, but not sexual in nature.[83]  Curiously, plaintiff complained to Dan Tyree about Hardin's frequent questions about why she talked to soldiers and his facial expressions, and explained to Tyree that she was merely answering the soldiers' questions about the menu.[84]  Tyree told plaintiff that Hardin probably thought that she was fraternizing with the soldiers, which was against company work rules.[85]  The record does not indicate whether Tyree apprized Hardin of plaintiff's complaint.

Around March of 2005, employees at the dining facility — including a female employee named "Faye," who plaintiff believed Hardin was dating — began "ganging

---

[79] *Id.*

[80] *Id.* at 266-67.

[81] *Id.* at 268.

[82] *Id.* at 269-70.

[83] *Id.* at 270-71.

[84] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 270.

[85] *Id.*

-16-

up" on plaintiff.[86]  When plaintiff addressed the situation with Hardin, particularly her problem with Faye, he "slammed his fist on the desk as hard as he could and . . . told [plaintiff] to get the F out" of his office.[87]  The dining facility then opened for a meal and plaintiff was crying while working as a "Head Counter."[88]  Plaintiff addressed "certain issues" with Clarence Davis, a mess attendant leader, by giving him "a [hypothetical] scenario."[89]  Plaintiff also told Mr. Weatherman, a co-employee, that "there was something going on [she] wanted to address to management but there's nobody [she could talk to]."[90]

After the incident of plaintiff crying at work, Tyree checked on plaintiff while she was working as a "Head Counter."[91]  Plaintiff told Tyree that "something was bothering [her] that [she] was uncomfortable talking about in the open."[92]  Tyree asked plaintiff "what was going on and [she] told him there was something [she] need[ed] to address.  [She] said somebody was bothering [her]."[93]  As plaintiff and Tyree were

---

[86] *Id.* at 252-53.

[87] *Id.*

[88] *Id.* at 253-55.

[89] *Id.* at 253.

[90] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 254-55.

[91] *Id.* at 255-56.

[92] *Id.*

[93] *Id.*

talking, soldiers began to come through the line.[94]  Plaintiff did not want to talk to Tyree in that environment because the situation was "sensitive" to her, and Tyree left.[95] Plaintiff did not again attempt to speak with Tyree.[96]

## F.    Plaintiff's Termination from K & K

Plaintiff was tardy in reporting to work on several occasions in late 2004 and early 2005.[97]  On April 8, 2005, Tyree met with plaintiff, in the presence of a union steward, and warned plaintiff that further tardiness would result in her termination.[98] Just two days later, on Sunday, April 10, 2005, plaintiff was scheduled to begin work at 15:15 [military time for 3:15 p.m.] for the 15:30 meal,  but she was several minutes late to work because of an inspection at the gate of Redstone Arsenal.[99]  Plaintiff attempted to call the dining facility to report that she had been delayed by the gate inspection, but the telephone line was busy.[100]  Plaintiff then called the cellular telephone of her aunt, Sun O.K. Williams, who was already at the dining facility, and "asked to speak with [Forrest] Kinney," the Cook I serving as manager that day.[101]

---

[94] *Id.*

[95] *Id.*

[96] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 255.

[97] *Id.* at 344.

[98] *Id.*, Exhibit F (Affidavit of Dan Tyree), ¶ 23.

[99] *Id.*, Exhibit A (Deposition of plaintiff), at 350.

[100] *Id.* at 354.

[101] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 354.

Kinney told plaintiff that "it's okay as long as [she was] coming into work."[102]  Plaintiff testified that, when she arrived at the dining facility, she passed by Kinney who allegedly said:  "go ahead *and sign in your regular time*, just get out there and situated to open up."[103]

Plaintiff then signed line two of the sign-in sheet, and indicated that she had arrived for work at her scheduled time, 15:15.[104]  At the time plaintiff signed line two, it had several scratch marks on it, and employees who had signed in before plaintiff had skipped line two.[105]  Plaintiff signed line two "underneath" the scratch marks.[106]

On April 11, 2005, the dining facility's secretary, Alice Fordham, reviewed the sign-in sheet from the previous day.[107]  Mrs. Fordham noticed that line 2 on the sign-in sheet had been scratched out and that plaintiff had signed line 2 near the scratch marks.[108]  Mrs. Fordham questioned Kinney and Jolly, and then requested that Tyree investigate the marks on the sign-in sheet.[109]   Tyree investigated by obtaining

---

[102] *Id*.

[103] *Id*. (emphasis supplied).

[104] *Id.* at 348-49.

[105] *Id.*, Exhibit A (Deposition of plaintiff), at 348-49 and Exhibit D (Affidavit of Ben Fordham), at Exhibit E (Time sheet of April 10, 2005).

[106] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 349.

[107] *Id.*, Statement of Undisputed Facts, ¶ 83.

[108] *Id.*

[109] *Id.*, Exhibit K (Affidavit of Alice Fordham), ¶ 6.

-19-

statements from several employees — Forrest Kinney, Ann Jolly, Davon Johnson, Manguelle Parker, and Cassadra Nunez — concerning what they had observed on April 10, 2005.[110]  Tyree selected these employees because they had signed the sign-in sheet near the time plaintiff checked in, and Kinney had told him that these employees would have knowledge of what had occurred.[111]  Forrest Kinney's statement reads as follows:

> On Sunday the 10th of April I was notified by Mrs. OK Williams that [plaintiff] was running late, because she was held up at the gate for inspection.  [Plaintiff] was one of the head counts for the day and would have signed in at 15:15 p.m.  Mrs. Williams went ahead and signed her daughter [sic] in at 15:15 p.m. instead of letting her do it herself.  [Plaintiff] finally showed up right after we opened at 15:30 p.m.  She arrived at 15:35 p.m. and signed the fabricated entry that Mrs. Williams had written in for her.  I told them at that time that what they had done could be considered fraud and that they should have brought it to my attention so I could make the proper corrections to the time sheet.[112]

Ann Jolly's statement provides:

> Mrs. Williams told me to leave a line open up for [plaintiff] on the sign-in sheet.  So, I did.  I saw Mrs. Williams write down HDCT and then marked threw [sic] it and I saw her write 15:15.  Then I left.  I had to go on line.  Then later about 8 or 10 minutes, I saw [plaintiff] run to the head count desk and let soldiers in.  There were about 25-30 soldiers outside waiting to come in.  I do know that she was late, but I so [sic] not know the exact time.  I have two witnesses that [Williams] wrote Headcount and marked through it.  When [plaintiff] came in, she just signed her name

---

[110] *Id.*, Exhibit F (Affidavit of Dan Tyree), ¶ 25 and Exhibit D (Affidavit of Ben Fordham), ¶ 21.

[111] *See* doc. no. 37, Exhibit F (Affidavit of Dan Tyree), ¶ 25.

[112] *Id.* at Exhibit Q (Statement of Forrest Kinney).

and ran to the headcount station.[113]

Tyree concluded on the basis of his investigation that plaintiff and her aunt had violated company work rules prohibiting falsification of time records by:  Williams instructing other employees to not sign line two of the sign-in sheet, and writing 15:15 as her niece's arrival time on line two; and plaintiff later signing-in on line two, and indicating that her arrival time was 15:15 when, in fact, she did not arrive until sometime later.[114]  Tyree recommended that Ben Fordham terminate both plaintiff and Williams for falsifying the April 10, 2005 sign-in sheet.[115]

Ben Fordham then considered the statements of other employees and the April 10, 2005 sign-in sheet, and he agreed with Tyree's recommendation to terminate both plaintiff and Williams.[116]  In an affidavit, Ben Fordham states that, "[a]lthough the statements contained small discrepancies as to time, I did not consider them contradictory because they all point to Line 2 of the sign-in sheet being held open, which is prohibited, and [plaintiff] signing in at 15:15, when she was not at work at that time."[117]  Mr. Fordham also states that he did not consider the statements contradictory

---

[113] *Id.*, Exhibit F (Affidavit of Dan Tyree), at Exhibit R (Statement of Jolly).

[114] *Id.*, Exhibit F (Affidavit of Dan Tyree), ¶ 31.

[115] *Id*. ¶ 32 and Exhibit D (Affidavit of Ben Fordham), ¶21.

[116] *See* doc. no. 37, Exhibit D (Affidavit of Ben Fordham), ¶ 22.

[117] *Id*. ¶ 22.

"because I had spoken to Forrest Kinney and Ann Jolly myself."[118] Fordham states that Jolly told him that Sun O.K. Williams had told her to skip line two of the sign-in sheet, in order to leave a space for plaintiff to sign-in at a later time.[119]

Tyree informed plaintiff and Williams that their employment was being terminated on April 13, 2005, because they had falsified statements on the sign-in sheet.[120]   Tyree also told plaintiff that it was Fordham's decision to terminate her.[121] Tyree further told plaintiff that Ben Fordham spoke with management of K & K about the termination, and she asserts that Tyree necessarily *implied* that Ben Fordham had spoken with Hardin about her termination because he was Assistant Manager of the dining facility.[122]   However, Ben Fordham and Tyree deny that either Hardin or Frederick Anderson was involved in the decision to terminate plaintiff's employment.[123] Mr. Fordham states that he "mentioned the fact that [plaintiff] and Mrs. Williams were to be terminated to Dennis Hardin, but I did not seek his input or approval into the decision."[124]

---

[118] *Id.*

[119] *Id.* ¶ 23.

[120] *Id.*, Exhibit A (Deposition of plaintiff), at 356.

[121] *Id.* at 346-47.

[122] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 353.

[123] *Id.*, Exhibit F (Affidavit of Dan Tyree), ¶ 32 and Exhibit D (Affidavit of Ben Fordham), ¶ 24.

[124] *Id.*, Exhibit D (Affidavit of Ben Fordham), ¶ 24.

G.     **Events After Plaintiff's Termination**

Following plaintiff's termination, she left a note for Ben Fordham at the dining facility.[125]   Several days later, when plaintiff had not received a response from Fordham, she called Frederick Anderson, in Kentucky, to discuss her termination.[126] Plaintiff and Anderson discussed her termination and allegations of sexual harassment.[127]   Anderson offered to meet plaintiff at the dining facility to discuss her allegations and investigate the matter, but plaintiff did not appear for the meeting for two reasons:  a union representative advised her to not meet Anderson; and she no longer had authority to be on Redstone Arsenal.[128]   Plaintiff received permission to meet Anderson at a conference room in the military police headquarters, but Anderson refused to meet her anywhere other than the dining facility.[129]   Plaintiff does not remember if she contacted Anderson after the missed meeting.[130]   Plaintiff filed a grievance with the union claiming wrongful termination, but the union dropped the grievance.[131]

---

[125] *Id.*, Exhibit A (Deposition of plaintiff) at 295.

[126] *Id.* at 292-93.

[127] *Id.* at 302-03.

[128] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 298-300.

[129] *Id.*

[130] *Id.* at 301.

[131] *Id.*, Statement of Undisputed Facts, ¶ 107.

**H.     Plaintiff's EEOC Charge and Complaint**

Plaintiff filed a charge of discrimination with the Equal Employment Commission ("EEOC") against K & K, but not KCA and Ben Fordham, on May 19, 2005, alleging sexual harassment, hostile work environment, and retaliation.[132]   The EEOC subsequently issued notice of her right-to-sue.[133]

## III. DISCUSSION

**A.     Whether KCA and Ben Fordham are Employers of Plaintiff**

KCA argues that plaintiff's claims against it are due to be dismissed because it did not employ plaintiff, and this court lacks subject-matter jurisdiction over non-employers.  *See Virgo v. Riviera Beach Associates, Ltd.*, 30 F. 3d 1350, 1359 (11th Cir. 1994).  Plaintiff contends that KCA was a joint employer.

Title VII defines "employer" as "a person [a term that includes an individual, partnership, or corporation] engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year, and any agent of such a person." 42 U.S.C. § 2000e(b). The Eleventh Circuit recognized the need for some embellishment of this definition, and answered the question of "whether an entity is an individual's employer" by

---

[132] *Id.*, (Exhibit D) (Affidavit of Ben Fordham), at Exhibit M (EEOC claim).

[133] *See* doc. no. 1 (Original Complaint), Exhibit A (Right to Sue Letter).

considering, at least initially, the following three factors: "(1) whether or not the employment took place on the premises of the alleged employer; (2) how much control the alleged employer exerted on the employees; and (3) whether or not the alleged employer had the power to fire, hire, or modify the employment condition of the employees." *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1255 (11th Cir. 2004) (citing, among other cases, *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995)).  District courts are instructed to be cognizant of the need to "interpret the term 'employer' liberally" when applying this test. *Virgo*, 30 F.3d at 1359.

KCA is located in Hopkinsville, Kentucky, and high-level KCA employees, such as the vice-president and the general manager, visit the Redstone Arsenal dining facility no more than five times a year.[134]  The general manager of KCA asserts that the managerial authority of the dining facility, including the power to hire and fire employees, rests with Ben Fordham, not KCA.[135]  The general manager also asserts that KCA performs administrative and consultative functions for K & K, such as processing the payroll, but that KCA does not have managerial authority or the authority to make decisions that affect the terms and conditions of the employment of K & K employees.[136]

---

[134] *See* doc. no. 37, Exhibit C (Affidavit of Frederick Anderson), ¶ 9.

[135] *Id.*, Exhibit T (Affidavit of Thomas Neville), ¶ 3.

[136] *Id.* ¶ 7.

Plaintiff argues that KCA is a joint employer of employees at the dining facility because its vice president, Frederick Anderson, acknowledged that he was part of K & K's chain of command, agents of KCA wrote the "company work rules" given to each K & K employee, and high-level KCA officials traveled to the Redstone Arsenal dining facility several times a year.  This court also notes that, after plaintiff and Williams filed union grievances concerning their termination, Frederick Anderson and the general manager of KCA traveled to the dining facility "to hear the grievances and investigate concerns raised by [plaintiff] during her telephone conversations with Mr. Anderson."[137]

When determining whether companies are joint employers of an individual, the Eleventh Circuit has considered the Department of Labor's examples of situations demonstrating the existence of joint employment relationships.  *See Morrison*, 383 F.3d at 1257-58.  These examples include the following:

> (1) Where there is an arrangement between employers to share an employee's services or to interchange employees; (2) Where one employer acts directly or indirectly in the interests of the other employer in relation to the employee; or, (3) Where the employers formatting may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 825.106(a).  When the evidence is viewed in the light most favorable to

---

[137] *Id.* ¶ 4.

plaintiff, the court finds the existence of a genuine issue of material fact concerning whether KCA shared control of plaintiff with K & K and Ben Fordham, because questions remain as to the extent of KCA vice president Frederick Anderson's power over the employment conditions of employees at the dining facility. Accordingly, summary judgment is not proper on this ground.

KCA and Ben Fordham also argue that plaintiff's failure to name them in her EEOC charge precludes her from filing suit against them. This court previously addressed that same argument in the memorandum opinion denying KCA's motion to dismiss or, in the alternative, for summary judgment.[138] This court noted that there are exceptions to the rule that "a party not named in the EEOC charge cannot be sued in a subsequent civil action." *Virgo*, 30 F.3d at 1358. "Where the purposes of the Act are fulfilled, a party unnamed in the EEOC charge may be subjected to the jurisdiction of federal courts." *Id.* at 1358-59.

> In order to determine whether the purposes of Title VII are met, courts do no apply a rigid test but instead look to several factors including: (1) the similarity of interest between the named party and the unnamed party; (2) whether the plaintiff could have ascertained the identity of the unnamed party at the time the EEOC charge was filed; (3) whether the unnamed parties required adequate notice of the charges; (4) whether the unnamed parties had an adequate opportunity to participate in the reconciliation process; and (5) whether the unnamed party actually was prejudiced by its exclusion from the EEOC proceedings.

---

[138] *See* doc. no. 24 at 14-16.

*Id.* at 1359. *See also*, *e.g.*, *Vital v. Interfaith Medical Center*, 168 F.3d 615, 619-20 (2d Cir. 1999) (applying an almost identical test).  This court previously found that filing the EEOC charge against K & K satisfied that the purposes of Title VII's administrative remedies requirements because of the interrelation of KCA and K & K.  This court perceives no substantial prejudice flowing to either KCA or Ben Fordham as a result of plaintiff's omission.  Thus, KCA and Ben Fordham are not entitled to summary judgment on a failure to exhaust theory.

Yet, and in any event, Ben Fordham cannot be held individually liable for a Title VII violation.  *See Albra v. Advan, Inc.*, 490 F.3d 826, 832 (11th Cir.2007) (citing *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991)).

**B.     Hostile Work Environment Sexual Harassment**

Plaintiff claims that Hardin's conduct and comments constitute sexual harassment in violation of Title VII.  Courts traditionally have grouped sexual harassment claims within two broad categories of conduct:  that is, either as *hostile work environment claims*, defined as a workplace permeated with unwelcome intimidation, ridicule, or insults based on the plaintiff's gender; or as *quid pro quo claims*, defined as a demand that an employee provide sexual favors in order to gain an employment benefit, or to

avoid an adverse employment action.[139]  "The difference between the two is that the former do not result in tangible employment actions, while the latter do."  *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1200 n.3 (11th Cir. 2001) (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751 (1998)); *see also, e.g.*, *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000).[140]

Neither plaintiff's amended complaint nor her brief in response to defendants' motion for summary judgment specify whether she is alleging (a) a hostile work environment claim, (b) a *quid pro quo* claim (*i.e.*, that her act of rebuffing Hardin's alleged sexually-suggestive remarks and conduct culminated in a tangible employment

---

[139]*See Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir. 1982) ("The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under [a *quid pro quo*] theory of sexual harassment."); *see also Mendoza v. Borden*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc):

> The paradigm of sexual harassment as federally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with the employer's sexual demands. . . . In such a case, traditionally described as quid pro quo harassment, the "discrimination with respect to terms or conditions of employment [is] explicit."

[140]The *Gupta* Court described the distinction as follows:

> There are two types of sexual harassment cases:  (1) quid pro quo, which are "based on threats which are carried out" or fulfilled, and (2) hostile environment, which are based on "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment."

*Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000) (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S. Ct. 2257, 2264, 141 L. Ed. 2d 633 (1998)).

action), or (c) both.  Plaintiff's amended complaint simply alleges that "Hardin's sexual harassment was unwelcome and was severe and pervasive enough to adversely affect the terms and conditions of her employment, including disciplinary action, changes in [her] work schedule, and ultimately, wrongful and pretexual termination."[141]  Plaintiff's brief in response to defendants' motion for summary judgment provides no assistance in the interpretation of her claim(s), because it vaguely states that "Hardin's sexual harassment of [plaintiff] did not stop until she was terminated from the workplace," and that "[r]egardless of the type of discrimination alleged by [plaintiff], the legal standards are similar."[142]

If, in fact, plaintiff is alleging what formerly was referred to as "a *quid pro quo* claim," she has not presented any evidence of the necessary element that "[her] reaction to the unwelcome behavior affected tangible aspects of the [her] compensation, or terms, conditions or privileges of employment."  *Virgo*, 30 F.3d at 1361.  Although plaintiff asserts that Hardin told her that she would be awarded with more (or better) hours if she was "good" to him, she has not presented any evidence indicating that Hardin decreased her hours over her second period of employment, or that Hardin awarded other employees with more (or better) hours.  Plaintiff has also failed to

---

[141] Doc. no. 25, ¶ 31.

[142] *See* doc. no. 56 at 32, 34.

produce any evidence indicating that disciplinary action or her termination resulted from her refusal of Hardin's alleged sexual advances.  Accordingly, plaintiff has failed to establish a *prima facie* case of a claim that her refusal of Hardin's sexual advances resulted in a tangibly-adverse employment action.

To succeed on a claim that Hardin's harassment created a sexually hostile work environment, plaintiff must show that:  (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment; and (5) there is a basis for holding her employer responsible under a theory of either vicarious or direct liability.  *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000).

The first element of a *prima facie* case is not in dispute.  As a female, plaintiff belongs to a protected group.  *See Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman.").  Defendants argue, however, that plaintiff cannot prove the remaining elements of a *prima facie* case — that is, that the alleged conduct was unwelcome, that all the alleged conduct was based on sex, that the

conduct complained of (even when considered in its totality) was sufficiently severe or

pervasive to establish a hostile work environment or that defendants are liable for

Hardin's conduct.

Defendants assert that, even assuming for the sake of argument that the events

about which plaintiff complains rose to the level of a sexually-hostile work-environment,

her claim still fails because, they say, they cannot be held liable for Hardin's behavior.

In this regard, defendants rely upon the affirmative defense announced by the Supreme

Court in its *Faragher* and *Ellerth* decisions.

> The defense comprises two necessary elements:  (a) that the
> employer [*I*] exercised reasonable care to prevent and [*ii*] correct promptly
> any sexually harassing behavior, and (b) that the plaintiff employee
> unreasonably failed to take advantage of any preventive or corrective
> opportunities provided by the employer or to avoid harm otherwise.  While
> proof that an employer had promulgated an anti-harassment policy with
> complaint procedure is not necessary in every instance as a matter of law,
> the need for a stated policy suitable to the employment circumstances may
> appropriately be addressed in any case when litigating the first element of
> the defense.  And while proof that an employee failed to fulfill the
> corresponding obligation of reasonable care to avoid harm is not limited
> to showing an unreasonable failure to use any complaint procedure
> provided by the employer, a demonstration of such failure will normally
> suffice to satisfy the employer's burden under the second element of the
> defense.

*Faragher*, 524 U.S. at 807-08; *see also Ellerth*, 524 U.S. at 765 (same); *Frederick v.*

*Sprint/United Management Co.,* 246 F.3d 1305, 1313 (11th Cir. 2001) (same).

"Both elements [of the affirmative defense] must be satisfied for the defendant-

employer to avoid liability, and the defendant bears the burden of proof on both

elements." *Frederick*, 246 F.3d at 1313 (citations omitted).

> A court's assessment as to whether a defendant has proved this defense
> requires, first, an analysis of whether the employer has exercised
> reasonable care in *preventing* sexually harassing behavior.  The court next
> directs its inquiry to whether the employee made reasonably sufficient use
> of available avenues to put the employer on notice of the problem.  Finally,
> the court refocuses on the employer to determine whether the employer or
> its authorized agent, after receiving notice of the harassment, took
> adequate steps to abate it and prevent its recurrence.

*Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1369 (11th Cir. 1999) (Barkett, J.,

concurring) (emphasis in original).

## 1.    First Element the *Faragher/Ellerth* affirmative defense

### a.    *Prevention prong*

An employer does not satisfy the prevention prong of the first element simply by

promulgating a policy prohibiting sexual harassment.  *See Frederick*, 246 F.3d at 1314

("[A]n employer's showing that it has a sexual harassment policy does not automatically

satisfy its burden.") (citing *Faragher*, 524 U.S. at 808 (denying an employer the

affirmative defense, even though it had promulgated a written sexual harassment policy,

because the employer had "entirely failed to disseminate [that] policy")).[143]  Rather, the

---

[143]*But see Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1297-98 (11th Cir. 2000),
stating:

> When crafting the first prong of the *Faragher* affirmative defense which
> requires, in part, that the employer exercise reasonable care to prevent sexual

employer must establish three facts:  (1) that it has "promulgated an effective and comprehensive" anti-harassment policy, *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1279 (11th Cir. 2002) (quoting *Farley v. American Cast Iron Pipe Co*., 115 F.3d 1548, 1554 (11th Cir. 1997)), (2) containing complaint procedures that are "'designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor,'" *Faragher*, 524 U.S. at 806,[144] and (3) that the policy was "aggressively and thoroughly disseminated" to its employees.  *Miller*, 277 F.3d at 1279 (quoting *Farley*, 115 F.3d at 1154); *see also, e.g., Frederick*, 246 F.3d at 1314 (holding that an employer is "required to show that its sexual harassment policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect") (citing *Madray v. Publix Supermarkets, Inc*., 208 F.3d 1290, 1298-99 (11th Cir. 2000)).

The court concludes that all three of these factors are present in the defendants' sexual harassment policy.  Throughout the course of plaintiff's employment, a sexual-

---

harassment, the Supreme Court sought to give effect to Title VII's deterrent purpose. . . . Accordingly, *the Supreme Court implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy*. . . . [Citations omitted; emphasis added.]

[144] In the textual passage to which this note is appended, the *Faragher* Court was quoting *EEOC Policy Guidance on Sexual Harassment*, 8 FEP Manual 405:6699 (March 19, 1990), and the bracketed alteration was in the original. *See also Ellerth*, 524 U.S. at 764, 118 S. Ct. at 2270 (noting "EEOC's policy of encouraging the development of grievance procedures," and citing the same publication).

harassment poster that directed employees to report claims of sexual harassment to either Dan Tyree or Ben Fordham was conspicuously posted in the hallway that employees walked through each day to sign-in for work.  The poster informed employees that sexual harassment is unacceptable, and encouraged employees to notify either Tyree or Fordham if the conduct of another person created an intimidating, hostile, or offensive work environment.  Further (and importantly, because both Tyree and Fordham worked at the dining facility), the poster provided their respective telephone numbers — thereby providing a means for employees to lodge complaints in a manner that was more private than a face-to-face discussion within the dining facility itself, possibly within the hearing of the offending supervisor or co-employee.  This court accordingly finds that the poster  provided a clear policy for reporting sexual harassment that encouraged victimized employees to report offenders, and that the policy was conspicuously posted and easily accessible to all employees.  Thus, defendants took reasonable care to prevent or investigate sexually harassing behavior.

### b.   *Prompt corrective action prong*

The second, or "remedial," prong of the first element requires the employer to exercise reasonable care to promptly correct any sexually harassing behavior.  "[A]n employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint."  *Frederick*, 246 F.3d at 1314 (citing *Madray*,

208 F.3d at 1302).  Careful analysis of the remedial prong reveals that it also has two facets, and that the first images the second element of the *Faragher/Ellerth* affirmative defense.  In other words, a district court must initially determine whether *the victimized employee* "made reasonably sufficient use of the channels created by [the employer's] policy to put [the employer] on notice of the ongoing harassment." *Coates*, 164 F.3d at 1364.  This prefigures the second element of the affirmative defense.  "The sole inquiry when the employer has a clear and published policy is whether the complaining employee followed the procedures established in the company's policy." *Breda v. Wolf Camera & Video*, 222 F.3d 886, 890 (11th Cir. 2000).

Thus, it is only when the court determines that adequate notice of the harassment *was given* by the victimized employee in accordance with the employer's policy that the court may proceed to a second level of inquiry — that of determining whether the employer took reasonably prompt and appropriate remedial action. *Coates*, 164 F.3d at 1364.  "When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003) (citing *Breda*, 222 F.3d at 889; *Coates*, 164 F.3d at 1364.  "Actual notice is established by proof that management knew of the harassment." *Watson*, 324 F.3d at 1259.

In the present case, the sexual-harassment poster at the dining facility clearly directed victimized employees to notify either Dan Tyree or Ben Fordham of harassment, and provided a means for the employee to do so privately, outside the work environment (*i.e.*, by means of telephone).  However, plaintiff has not presented any evidence indicating that she notified either Tyree or Fordham of Hardin's alleged harassment prior to her termination.  Plaintiff acknowledges that she knew that she could have reported Hardin's inappropriate behavior to Tyree, and that she once informed Tyree that Hardin frequently questioned her about talking to soldiers, but plaintiff never specifically informed Tyree (or Fordham) of Hardin's alleged sexual harassment.  Moreover, plaintiff's subjective fear of termination for reporting Hardin's conduct does not excuse her failure to contact Tyree or Fordham.  *See Walton v. Johnson & Johnson Services., Inc.*, 347 F.3d 1272, 1290-91 (11th Cir.2003) ("[A]bsent a credible threat of retaliation . . . subjective fears of reprisal do not excuse [the] failure to report . . . alleged harassment.") (citations omitted).

Plaintiff's ambiguous statement to Tyree that "somebody was bothering her" also does not constitute actual notice of the harassment by Hardin.  In *Miller*, the Eleventh Circuit noted that it has

> held that merely showing a supervising manager a sexually suggestive note, received by an employee from a coworker, did not adequately apprize the manager of "the dimensions of the problem or even that there

-37-

> was a problem that required his attention," and therefore did not rise to the
> level of "actual notice" to the employer necessary to impose liability under
> Title VII.

*Miller*, 277 F.3d at 1278 (citing Coates, 164 F.3d at 1365).  Likewise, in the present

case, plaintiff did not apprize Tyree "of the dimensions of the problem," because she did

not identify *who* was "bothering" her, or specify that the botherment was sexual in

nature.  In short, plaintiff has not produced *any* evidence that defendants had *actual*

*notice* of Hardin's alleged sexual harassment.

Of course, a plaintiff can demonstrate that an employer possessed *constructive*

*knowledge* of harassment "by showing the pervasiveness of the harassment, which gives

rise to the inference of knowledge or constructive knowledge." *Henson*, 682 F.2d at 905

(emphasis supplied).  The Eleventh Circuit has held the following factors to be relevant

when considering whether a plaintiff has demonstrated an employer's constructive

notice of harassment: "(1) the remoteness of the location of the harassment as compared

to the location of management; (2) whether the harassment occurs intermittently over

a long period of time; (3) whether the victims were employed on a part-time or full-time

basis; and (4) whether there were only a few, discrete instances of harassment." *Miller*,

277 F.3d at 1278-79 (quoting *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th

Cir.1997)).

The court finds that plaintiff has not presented sufficient evidence to raise a

genuine issue of material fact as to whether either Dan Tyree or Ben Fordham had

constructive notice of Hardin's alleged harassment.  While plaintiff, Hardin, Tyree, and

Fordham each worked full-time, or nearly full-time, in the same dining facility, it is clear

that Hardin's harassment of plaintiff was very discrete and occurred over the course of

eight months.  Hardin's harassment of plaintiff *at the dining facility* consisted of rubbing

up against her approximately ten times over five months, telling plaintiff that he was

"well packed," and that she "wouldn't be able to handle him," telling plaintiff that he

acquired veneers for his teeth in order to be more attractive to her, and telling plaintiff

that she would receive more (or better) hours of work if she was "good" to him.[145]  The

other harassment of which plaintiff complains occurred at Hardin's home, or during calls

made to plaintiff's cellular or home telephones.

Moreover, plaintiff states that Hardin was "pretty sly" about not rubbing up

---

[145] Not all Hardin's conduct and comments of which plaintiff now complains were based on sex.  "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . *because of* . . . sex.'"  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (emphasis supplied); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1254 (11th Cir. 1999) ("Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace.") (Edmondson, J., concurring).  The "critical issue," according to the Supreme Court, "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).  Plaintiff states that she did not consider the following conduct and comments by Hardin to be sexual in nature:  Hardin's comment to plaintiff that he was upset that she married and left the area without telling him, his comment "to get the F out of his office," and his questions and agitation about plaintiff for talking to soldiers.

against her "in front of other employees" or "people."[146]  Hardin allegedly would rub up against her only after a meal, and "everybody [had] clear[ed] out" of the dining room.[147]  Plaintiff also asserts that other employees were not around when Hardin made sexual comments to her.  Additionally, plaintiff states that her aunt, Sun O.K. Williams, who often worked at the dining facility with plaintiff, sent her to Hardin's home in March of 2005 to pick-up Avon products because even she was unaware of Hardin's harassment.

Even when all of this evidence is viewed in the light most favorable to plaintiff, the court still finds that she has failed to make a showing sufficient to establish that Hardin's harassment of her was so pervasive as to provide either Dan Tyree or Ben Fordham with constructive notice.  Thus, plaintiff has failed to establish a *prima facie* case because she cannot show that defendants knew, or should have known, about Hardin's harassment, and defendants have produced sufficient evidence to support an affirmative defense.  Accordingly, summary judgment is due to be granted on plaintiff's claim of sexual harassment.

**C.    Retaliation**

Plaintiff also attempts to claim that she was terminated in retaliation for refusing

---

[146] *See* doc. no. 37, Exhibit A (Deposition of plaintiff), at 258-261.

[147] *Id.* at 260.

a sexual relationship with Hardin.[148]   However, plaintiff's attorney misconstrues the

essence of the claim of retaliatory termination, which is that an employer unlawfully

terminated an employee *because he or she engaged in a protected activity*.   Plaintiff has

failed to present any direct evidence of discrimination, or any evidence indicating that

*she* engaged in statutorily protected activity.   Plaintiff's brief in response to defendants'

motion for summary judgment states:

> Discriminatory animus by someone who was not a final decision
> maker, but who was nonetheless an "integral part of the multi-level hiring
> process," may influence the final decision maker and "taint[]" the entire
> process. *Shoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).   In
> the instant case, Hardin, who had sexually harassed Reed, was present at
> her termination for allegedly falsifying company time records. He bragged
> to her about getting his way in other employee management disputes.
> Once Sun Williams made the complaint to C.I.D. about Ferlethia
> Shepherd, one of Hardin's girlfriends, and Tyree and Fordham were
> questioned, she and Sunna Reed were targeted by Tyree, Fordham, and
> Hardin.

> The ultimate fact of discrimination arises from the falsity of the employer's
> explanation.   It is a form of circumstantial evidence from which the trier
> of fact can reasonably infer a discriminatory purpose.   Such an inference
> is based on the general principle of law that a party's dishonesty about a
> material fact is affirmative evidence of guilt. *Reeves* [*v. Sanderson*], 120
> S. Ct. [2097], 2108 [2000].   In the instant case, there are a number of

---

[148] *See* doc. no. 25 (Amended Complaint), ¶¶ 21, 22.   Plaintiff asserted that "[she] was terminated in retaliation for refusing a sexual relationship with Hardin," in the "Statement of Facts" portion of her amended complaint, but she does not allege a claim of retaliatory termination. Defendants' brief in support of its motion for summary judgment noted that "[n]either plaintiff's Complaint nor Amended Complaint contained a retaliation count. (Docs. No. 1 & 25).   However, since plaintiff contends that she was retaliated against, within her Complaint Defendants address this argument." Doc. no. 37, at 36 n. 10.

discrepancies, which may lead a trier of fact to conclude the falsity of the explanation for Ms. Reed's termination, including that Jolly herself violated the policy by skipping a line to sign-in, and wrote in a different time from when she came to work.  The work rule Ms. Reed is alleged to have violated is routinely violated.  She was told she was fired because her mother had signed in for her, then told she was fired for writing in the wrong time.  Management actually tells employees to write in a different time that when they get there, thereby falsifying the time record.[149]

Plaintiff has not offered any "direct evidence" indicating that the termination of her employment was in retaliation for activity protected by federal statute.[150]  Therefore,

---

[149] Doc. no. 56 at 40-41.

[150] Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption.  *See, e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (holding that the term "direct evidence," when used in the context of Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination").  Moreover, "[t]o amount to direct evidence, a statement must:  (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus."  *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

In the context of a Title VII retaliation claim, however, direct evidence may be more precisely defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'"  *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998) (in turn quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990))).  In *Merritt v. Dillard Paper*, for example, the Eleventh Circuit held that a statement made by the president of a corporate employer to the plaintiff prior to firing him, concerning deposition testimony given by the plaintiff in a sexual harassment suit filed by a female co-employee — *i.e.*, "[y]our deposition was the most damaging to Dillard's case, and you no longer have a place here at Dillard Paper Company" — was direct evidence of a retaliatory motive:  "The statement made in the present case is the equivalent of 'Fire Merritt — he gave the most damning deposition testimony.'"  *Merritt*, 120 F.3d at 1190.  *Cf. Earley v. Champion International Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (holding, in the context of an ADEA claim, that the quintessential example of direct evidence would be "a management memorandum saying, 'Fire Earley — he is too old.'"); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same).

"Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence."  *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996);

she must prove this claim, if she proves it at all, with circumstantial evidence, navigating

the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411

U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248

(1981).   The *McDonnell Douglas* analytical formula applies to retaliatory discharge

claims, as well as Title VII disparate treatment allegations.   *See Hurlbert v. St. Mary's*

*Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).   Generally speaking,

a plaintiff must prove three elements to establish a *prima facie* case of retaliation:   (1)

she engaged in statutorily protected expression; (2) she suffered an adverse employment

action; and (3) there was a causal linkage between the protected conduct and the

adverse employment action.   *See*, *e.g.*, *Shannon v. BellSouth Telecommunications, Inc.*,

292 F.3d 712, 715 (11th Cir. 2002); *Bass v. Board of County Commissioners*, 256 F.3d

1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service,*

*Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).   "If the plaintiff makes out a *prima facie* case,

the burden shifts to the defendant to articulate a legitimate reason for the adverse

action."   *Hurlbert*, 439 F.3d at 1297.   If the defendant does so, the plaintiff must then

show that the defendant's proffered reason for the adverse action is a pretext for

retaliation.   *See id*.

　　　　Defendants argue that plaintiff cannot show either protected activity or causation,

---

*see also Merritt*, 120 F.3d at 1189 (same).

because she failed to report any of the allegedly harassing conduct to Tyree or Fordham prior to her termination.[151]   Indeed, the record is clear that she only reported the alleged harassment to Frederick Anderson *after* her termination.   Plaintiff argues, nevertheless, that Hardin was "present" at her termination, and that he influenced Tyree and Fordham to terminate her.

Yet, the fact remains that plaintiff has not produced any evidence demonstrating that she engaged in protected activity.   Plaintiff has failed to provide probative evidence sufficient to create a genuine issue of material fact as to whether any decision maker involved in her termination was aware of Hardin's harassment, or her alleged refusal of a sexual relationship with Hardin.   Accordingly, the claim must fail as a matter of law.

---

[151] With regard to the third element — the requirement that a plaintiff produce evidence demonstrating a casual linkage between the protected activity and the adverse employment action complained of — this part of a *prima facie* case is far easier to establish at the summary judgment stage than at trial, where it must be proven by a preponderance of the evidence.   At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).   "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action."  *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).   *Accord Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.").   *See also*, *e.g.*, *Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("[A] plaintiff must show that 'the decisionmakers were aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'") (quoting *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999)).

**D.     State Law Claims**

All of plaintiff's remaining claims are based upon state law.  This court's jurisdiction over these claims is governed by 28 U.S.C. § 1367, the pertinent portion of which provides that,

> in any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  Even so, "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

This court exercises its discretion and declines to exercise supplemental jurisdiction over plaintiff's remaining state-law claims.  *See*, *e.g.*, *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims.").

## III. CONCLUSION

In accordance with the foregoing, summary judgment will be granted on all of

plaintiff's federal claims.  Her state-law claims will be dismissed without prejudice to her right to pursue them in a state forum, if she so chooses.  An appropriate order will be entered contemporaneously herewith.

DONE this 29th day of September, 2008.

United States District Judge